# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **RICKI G. WYMORE,** | ) | **CASE NO. 4:06CV3079** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **JO ANNE B. BARNHART, the** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on appeal from the final decision of the Commissioner in which she denied benefits under the Social Security Act to the Plaintiff, Ricki G. Wymore.  Wymore filed an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq., and an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  (Tr. 65-67, 337-40).  Wymore's applications were denied initially and upon reconsideration (Tr. 34-41, 44-48).  On November 23, 2004, following a hearing, administrative law judge Jan Dutton (hereafter "ALJ") issued her decision that Wymore was not disabled as defined in the Act.  (Tr. 15-30).  Wymore's request for review was denied by the Appeals Council on January 27, 2006.  (Tr. 7-10).

## Statement of Facts

### *Medical Background*

Ricki Wymore  was born in 1949, and he alleges disability beginning December 1, 2001, due to carpal tunnel syndrome; asthma; bipolar disorder or mood disorder; hepatitis B & C; depression; and pain in the neck, back, wrists and hands.  (Tr. 87-96).  His prior health problems include that in 1985, Wymore had a laminectomy at L4-L5.  In

approximately 1990, he fell off a truck and injured his left shoulder.  In 1991, X-rays revealed moderate degenerative changes in the mid to lower cervical spine, which resulted in a physician restricting him from lifting more than 50 pounds occasionally and 30 pounds continually.  In December 1991, an MRI revealed a cervical protrusion of the disc at C6-C7 (Tr. 254), and Wymore was further restricted from repetitive rotation and lateral flexion movements of the neck.

In December 1993, Wymore was under the care of a board certified psychiatrist, John D. Baldwin, M.D., who provided his 1993 opinion that Wymore suffered from a mood disorder, Bipolar Disorder (mixed), and at that time, substance abuse.  In 1993, Dr. Baldwin was of the opinion that Wymore's condition "represents a considerable and substantial limitation or handicap" though Dr. Baldwin conceded that some of it was "of his own making and should be evaluated accordingly."  (Tr. 244).

Wymore's more recent health problems are documented as of approximately 2001.  In early 2001, Wymore was being treated at the Gage County Medical Clinic for neck and low back pain, and he was prescribed Vicodan to manage the pain.  In August and September 2001, he was seen with complaints of depression and pain, at  which time he described a significant history of depression.  Vicodan for the pain and Zoloft for the depression were prescribed.  Treatment notes indicate that his pain was managed with Vicodan and his depression improved with the Zoloft, though he had to contend with side effects.  (Tr. 248).

On November 13, 2001, Wymore began treating with Hai H. Tran, M.D., for complaints of  left shoulder and upper back pain.  (Tr. 271).  A week later, Wymore hit his head at work; he was treated in the emergency room, and a prescription for Vicodan was

2

refilled in November and in December.  (Tr. 246).  Dr. Tran's notes indicate that when Wymore was seen in follow-up to the accident on November 26, 2001, Plaintiff's left shoulder pain and upper back pain was "temporarily controlled with medication," and that his  range of motion was "ok" with no weakness.  (Tr. 270-71).  The note also indicates that Wymore's asthma was under control. (Tr. 270).

Wymore presented to Dr. Tran on December 6, 2001, complaining that his back and arm pain had worsened.   He stated that he had recently started a new job.  After counseling Wymore regarding the potential for addiction and abuse of these prescription medications, Dr. Tran prescribed Oxycontin and Vioxx. (Tr. 269). On December 26, 2001, Wymore presented again with head and upper back pain, a dry cough and runny nose. Dr. Tran again prescribed Oxycontin.  (Tr. 268).

In 2002, Wymore was employed intermittently during the months of January, April through July, and October through December, earning a total of approximately $6,194.

On May 3, 2002, Wymore presented again to Dr. Tran with complaints of back pain, "after a good long time free of pain."  (Tr. 267).  Dr. Tran prescribed Vioxx and Oxycontin and the risk of addiction to these drugs was discussed.   (Tr. 267).   On physical examination, Wymore displayed full range of motion in his neck,  but with pain. (Tr. 267).

From May 2002 through April 2003, Dr. Tran followed Wymore's condition by monthly examinations and managing the pain in his neck, shoulders, upper back and lower back with prescription medications including Oxycontin.  (Tr. 259-272, 329-335).  The records reflect constant pain in the neck area and lower back, and increasing pain to other areas, primarily including his upper back and shoulders. In July 2002, Dr. Tran's notes indicate that Wymore was having pain in the trapezius and back area and into the left arm.

3

Dr. Tran noted the X-ray findings of herniation in C5-6 and C6-C7.  (Tr. 266).  On August 16, 2002, Wymore presented with continuing neck pain and of fatigue, nausea, vomiting and blood discharge secondary to Hepatitis B and C.  On physical exam, Dr. Tran noted that Wymore's neck was painful and stiff, but he had no muscle weakness.  Dr. Tran refilled the Vioxx and Oxycontin, and ordered liver enzyme and lipid panels.  (Tr. 265).  These liver function tests showed only slightly abnormal AST and ALT results.  (Tr. 259, 272).

In September 2002, Wymore presented with complaints of neck pain and cold symptoms.  (Tr. 264).  In October, he complained of ongoing pain in the neck and both shoulders.  In November, he presented with asthma-related symptoms, including shortness of breath, which had stabilized by the December appointment.  In December, Wymore noted his continuing complaints of pain in the neck area.  (Tr. 261).

On January 7, 2003, Dr. Tran examined Wymore for purposes of providing an opinion regarding the extent of his disability.  On that date, Wymore complained of pain in the lower back and neck and feelings of depression.  (Tr. 262-63).  On examination, Dr. Tran found that Wymore had only "fair" range of motion, that his lungs were clear, and his mental status was stable. (Tr. 260).  In a letter dated January 15, 2003, Dr. Tran identified Wymore's health problems as including asthma that could be controlled with medication; hepatitis C;  low back pain secondary to the 1985 laminectomy; shoulder and back pain with numbness in his arms and hands secondary to degenerative disc disease at C4-C7; and a disc protrusion at C6-7.  (Tr. 259).   Dr. Tran suggested further evaluation by an orthopedist and obtaining an updated MRI.  Dr. Tran restricted Wymore from working in

4

cold environments and performing heavy lifting, bending, and twisting until the evaluation was completed.  (Tr. 259).

Wymore continued to treat with Dr. Tran monthly through April 2003.  Throughout these months leading up to his surgery, Wymore continued to state that he has pain in the neck and back, at the shoulder and at the wrist joint.  Dr. Tran continued to counsel Wymore about the risks of Oxycontin, and refill his prescription for Oxycontin.

An updated MRI of Wymore's cervical spine was not obtained until May 5, 2003.  The MRI revealed severe central spinal stenosis with spinal cord compression at C4-C5, C5-C6, and C6-C7; edema at C6-C7; generalized disc bulging and hypertrophic osteophyte formation; a small focal midline disc protrusion at C7-T1; and involvement of the nerve roots at C3, C5, C6, and C7, most severely compromised at C6-C7.  (Tr. 289-90).  The MRI revealed minimal intervertebral disc protrusion at C6-C7 and mild posterior bulging at C5-C6.  (Tr. 289).

**Treatment of Cervical Compression**

Sometime in April 2003, Wymore's case worker recommended that he seek his medical care through the Lincoln Lancaster County Health Department ("County"), apparently to become eligible for medical benefits.  Hal Pumphrey, M.D., began treating Wymore, and promptly referred him to a neurologist for evaluation.  Neurologist Brian Boes, M.D., evaluated Wymore's hand numbness on April 23, 2003.  (Tr. 285-87).  Dr. Boes found some lower extremity weakness on the left, slight numbness in Wymore's fingertips bilaterally (though greater on the left), and biceps muscle atrophy that was greater on the left side.  (Tr. 286-87).  Dr. Boes diagnosed probable cervical myelopathy and superimposed bilateral carpal tunnel syndrome.  (Tr. 287).  Dr. Boes ordered the MRI

5

that was performed on May 5, that established that Wymore's spinal cord was compressed at C4-C5, C5-C6, and C6-C7; that he had spinal cord swelling at C6-C7; generalized disc bulging and hypertrophic osteophyte formation; a small focal midline disc protrusion at C7-T1; and involvement of the nerve roots at C3 -C7, most severely compromised at C6-C7. (Tr. 289-90). The MRI also revealed minimal intervertebral disc protrusion at C6-C7 and mild posterior bulging at C5-C6. (Tr. 289).

Based on the MRI findings, Wymore was referred to neurosurgeon Benjamin Gelber, M.D., who examined Wymore on May 23, 2003, and reviewed the MRI scan. Dr. Gelber found that Wymore had a spastic gait and positive Hoffman's sign bilaterally. Dr. Gelber recommended a cervical discectomy, decompression, and anterior interbody fusion at C5-C6. (Tr. 291). On June 17, 2003, Dr. Gelber performed a discectomy with decompression at C5-C6, and an interbody fusion at *two* levels covering C5-C7. Wymore demonstrated immediate improvement in his gait. (Tr. 304-07). Dr. Gelber prescribed hydrocodone for pain management following the surgery on June 23 and 27 and again on July 7, 2003. (Tr. 314). On July 16, 2003, Dr. Gelber prepared a note stating that Wymore should be off work indefinitely. (Tr. 312). Dr. Gelber recommended that Wymore be followed by his family practice physicians, the County's physicians, during his recovery, though Dr. Gelber continued to see Wymore and to refill Wymore's prescription for hydrocodone through September 2003. (Tr. 291).

Wymore was followed by the County's physicians from June 2003 though April 2004. As Dr. Tran had, the County physicians continued to refill Wymore's prescription for Oxycontin. A note from August 2003 reflects that Wymore did not feel as though the surgery had improved his pain measurably, and the physician characterized his pain as

6

"chronic." On examination in December 2003, Lisa Rauner, M.D., found slightly decreased lower extremity strength on the left, although "good" muscle strength was noted, with no atrophy. (Tr. 325). Before refilling his Oxycontin, she confirmed with Dr. Gelber's office that he was not contemporaneously prescribing Oxycontin, and his office confirmed that his last prescription had been ordered in September. (Tr. 325).

In September and October 2003, Wymore also returned to Dr. Tran, complaining of stiffness, pain in his neck, decreased range of motion, and soreness following a motor vehicle accident in early October. Dr. Tran prescribed Vioxx, and in October, Dr. Tran and Wymore discussed addiction and abuse issues and the possibility of referral to a pain clinic. (Tr. 329-30). Dr. Tran restricted him from working until November 11, 2003. (Tr. 331).

On January 30, 2004, Wymore complained to County physician Dr. K. Haefele that he was in chronic pain. (Tr. 324). Dr. Haefele observed that he was managing well in spite of the pain: Wymore could rise from a seated position on a rolling stool, get up on the examination table, and go through simple back maneuvers, but through all he complained of pain. (Tr. 324). Dr. Haefele also noted that Wymore's asthma was stable. (Tr. 324). Dr. Haefele refilled Wymore's prescription for Oxycontin, noting that there was still hope that Wymore's condition would improve. In notes from March 16, 2004, a County physician (appears to be R. Cruiz, M.D.) expressed concern that there was no documentation that anyone was actively managing Wymore's health problems, and he decided to refill the Oxycontin for only two weeks pending receipt of additional information. (Tr. 324, 323). A notation from a telephone call shows that Wymore told the County physicians that he was still getting treatment from Dr. Gelber's office. (Tr. 324).

7

On March 17, 2004, Wymore presented to Dr. Gelber's office and was seen by his physician's assistant. Wymore explained that he had attempted to go back to work, but that he had lost his job because of neck pain. On examination, neck and right shoulder pain was noted, and Wymore went for additional X-rays. The physician's assistant gave Wymore samples of Bextra and Skelaxin to try and gave him a one-time prescription for hydrocodone. Cervical spine x-rays taken on March 17, 2004, showed a stable C5-C7 anterior fusion with chronic changes and osteophytes at C4-C5. (Tr. 319).

Wymore returned to the County for an examination by Brian Bossard, M.D., on April 14, 2004. Dr. Bossard became concerned that Wymore was receiving prescription pain relief from the County and from Dr. Gelber's office, and contacted Dr. Gelber's office. (Tr. 322). Dr. Bossard counseled Wymore that he could be developing an addiction to the Oxycontin, and Wymore stated that he would wean himself off the medicine by reducing his dose to one per day. Based on the medical records and Wymore's testimony, it appears that he did just that as there is no evidence of addition prescriptions after that date. Indeed, there is no record that Wymore was treated again before the disability hearing conducted on June 30, 2004, and there are no medical records in the hearing record after April 2004 until Dr. Gelber's note dated January 27, 2005, which was received after the hearing record was closed by the Appeals Council.

While there is no evidence that Dr. Gelber treated Wymore after March 2004, in his note of January 27, 2005, Dr. Gelber stated that following surgery for cervical myelopathy, 18 months was considered an adequate amount of time for healing and to reach maximum medical improvement. (Tr. 344). Dr. Gelber felt it reasonable that, during that 18-month

8

period of time, Plaintiff would not be able to perform his previous employment as a painter. (Tr. 344).

***Psychological Evaluation and Evidence***

Before the MRI was obtained in May 2003 and before his cervical fusion surgery, Wymore presented for a mental evaluation in connection with his disability application. On February 22, 2003, Wymore was evaluated by A. Jocelyn Ritchie, J.D., Ph.D.. (Tr. 273-77). Dr. Ritchie found Wymore's affect was restricted and almost blunted, but his speech rate, volume, tone, and prosody were normal. (Tr. 275). Dr. Ritchie found that Wymore's thought content was logical and goal-directed, and there was no evidence of any frank psychotic process. (Tr. 275). Wymore denied recent suicidal ideation, but he indicated that he was usually depressed. (Tr. 275). He stated that he felt worthlessness and that he had difficulty concentrating. (Tr. 275).

Following examination, Dr. Ritchie reported that Wymore's attention and concentration were within normal limits; he was oriented to person, time, and place; and his recent and remote memory were intact. (Tr. 275). Dr. Ritchie found his "new verbal learning was impaired," (which is indicative of short term memory impairment), but his higher cognitive functioning was within normal limits. (Tr. 275-76). Dr. Ritchie opined that Wymore had 1) restrictions of activities of daily living, 2) difficulties in maintaining social functioning, 3) recurrent episodes of deterioration when exposed to stress, 4) some impairment of memory, 5) and by report difficulties sustaining concentration and attention, and 6) difficulty relating to coworkers and supervisors. (Tr. 276, 278). Dr. Ritchie also found that Wymore could adapt to changes in environment and handle his own funds. (Tr.

9

276, 278).  She evaluated his Global Assessment of Functioning ("GAF") score to be 40,[1] and she noted that Wymore might find some relief with a combination of pharmacotherapy and cognitive behavioral therapy. (Tr. 277).

On May 15, 2003, a week before Wymore underwent a two-level cervical fusion, he presented for a state agency psychiatric review conducted by Rebecca Brayman, Ph.D. (Tr. 203-221).  Dr. Brayman noted that Wymore has affective, anxiety, and personality disorders.  She noted that he had substance abuse and addiction disorders in the past, and that by history, were in full remission.  With regard to the affective disorder, Dr. Brayman noted that Wymore suffers from 1) depressive syndrome, with symptoms of anhedonia, feelings of guilt or worthlessness, difficulties in concentration and thoughts of suicide; and from 2) bipolar syndrome with a history of episodic periods of manic and depressive syndromes. (Tr. 206).  Dr. Brayman also concluded that Wymore suffers from severe panic attacks and personality disorder not otherwise specified.  In Dr. Brayman's opinion, Wymore's psychological features impose moderate limitations in his activities of daily living, in maintaining social functioning and in concentration, persistence and pace. (Tr. 213).  Dr. Brayman determined in the mental RFC assessment that Wymore had moderate limitations in several areas, including the ability to remember, understand and carry out detailed instructions, and the ability to maintain concentration and attention for extended periods of time.   She found him capable, from a mental standpoint, of

---

[1] The GAF score is used to measure social, occupational or school-related functioning.  A score in the mid-60s to 70 generally reflects mild to moderate symptoms and some mild to moderate difficulty in social, occupational, or school functioning, but generally stable functioning with some meaningful interpersonal relationships. (DSM - IV- TR, (4th ed. p. 34)).  A score of 40-50 reflects a low level of functioning.  *Id.*

performing simple, unskilled employment. Dr. Brayman's report was reviewed and affirmed on September 25, 2003.

**Physical Functional Capacities Evaluation**

A physical disability evaluation was performed by an agency physician, Ruilin Wang, M.D., on March 21, 2003. (Tr. 279-83). Obviously, Dr. Wang did not have the benefit of the May 2003 MRI findings. Wymore described his physical problems as including chronic lower back pain and neck pain, bilateral carpal tunnel syndrome, asthma, and hepatitis B and C. (Tr. 280). Wymore told Dr. Wang that he could walk no more than one block at a time, and that he could sit or stand for less than 30 minutes at a time. Dr. Wang noted that Wymore was in no acute distress, but that he had occasional wheezing with no crackles. (Tr. 280-81). Dr. Wang found his gait was stable and balanced, both shoulders and elbows showed normal range of motion, and his grip strength was 5/5 bilaterally, though he had decreased motor strength in both hands and loss of sensation at his fingertips. He found Wymore's wrist range of motion was limited. (Tr. 281). In addition, Wymore's cervical flexion extension was limited to 30 degrees and lateral flexion to 30 degrees on the right and 10 degrees on the left. (Tr. 281). Dr. Wang attributed Wymore's neck pain to an old injury, and he suggested that Wymore "needs further pain management for his back," and he provided his impression that Wymore suffers from chronic low back pain, neck pain, asthma, carpal tunnel syndrome, hepatitis B and C, and an addiction to smoking. (Tr. 282).

R.E. Harley, M.D., also evaluated Wymore's functional capacities, on May 13, 2003. (Tr. 193-202). Dr. Harley relied on Dr. Wang's findings on examination and reviewed the medical records. Dr. Harley found that Wymore has "severe medically determinable impairments of degenerative disc disease (C6-7), asthma, probable CTS, and degenerative

11

changes at L4-5 and L5-S1." He observed that his "main treatment for his neck disorder over the past 18 months has been narcotic pain medicine." He stated that Wymore's wrist and hand pain was apparently new. Dr. Harley found Wymore's descriptions of pain to be "only partially credible." (Tr. 193-202).

At the end of July 2003, another medical review was requested along with a request to consider whether Wymore had experienced twelve months of disability. Dr. Glen Knosp reaffirmed the opinions of Dr. Harley, and the restrictions that were first expressed in March 2003, and stated that he believed the onset of disability was May 1, 2003, and that he was not disabled before that date. (Tr. 284).

While there is no evidence that Wymore was treating with Dr. Gelber after April 2004, in a note dated January 27, 2005, Dr. Gelber stated that following surgery for cervical myelopathy, 18 months was considered an adequate amount of time for healing and to reach maximum medical improvement. (Tr. 344). Dr. Gelber felt it reasonable that, during that 18-month period of time, Plaintiff would not be able to perform his job as a painter. (Tr. 344).

### Wymore's Testimony

An administrative hearing was held on June 30, 2004, during which Wymore, who was represented by counsel, testified. (Tr. 345-98). Wymore stated that he was presently working part-time, driving a truck, and that there were no other physical requirements of the job such as lifting or bending. (Tr. 355, 362). He worked in 2001 driving a forklift, but was fired for missing too much work because of his back pain, and he drew unemployment benefits for three to four months. (Tr. 360-61). Wymore explained that he attempted to

12

return to his past employment as a painter in 2002, which he did intermittently, but that he was fired because he could not keep pace with the other painters. (Tr. 83, 361-62).

Wymore claims an onset date of December 1, 2001, which is connected to increasing back and arm pain and, apparently, his inability to maintain employment. Wymore was not under any physician's treatment for neck or back pain at the time of the hearing, and he said he is not handling the pain well without prescription medication. (Tr. 367-68). He stated that his primary physician from the end of 2001 through early 2003 was Dr. Tran, and he had prescribed Oxycontin that relieved his back pain for several months. He stated that Dr. Tran "cut [him] off" of Oxycontin because he thought the medicine was too addictive. (Tr. 365, 368). Wymore said that he was able to wean himself off the Oxycontin by gradually reducing his intake from two doses to one dose.

In addressing the ALJ's concerns about what she characterized as drug-seeking behavior, Wymore explained that he sought treatment from two clinics at the same time based on the suggestion of his case worker. (Tr. 365). Wymore was being treated by the County's physicians as primary care providers, and through their referral, by Dr. Gelber for the neurosurgery. The neurosurgeon followed him briefly, but the medical records establish that his primary treatment and chronic pain management was provided by the County physicians. Wymore explained that he stopped treating with the physicians because the physicians had been notified that Wymore no longer was eligible for health benefits, and it had nothing to do with their decision to stop prescribing the narcotic pain relief. (Tr. 365, 369).

Following the cervical fusion surgery in 2003, Wymore testified that his "coordination" improved, which correlates with the medical records noting improved gait

13

and decreased spasticity.  However, Wymore stated that he could not walk, stand, or sit for  "very long."  (Tr. 385-86).  Although Dr. Boes recommended additional treatment for carpal tunnel syndrome,  Wymore has not returned for treatments based on his belief that his medical coverage has been withdrawn.   (Tr. 364).   With regard to his physical capabilities, Wymore testified that he cannot do any lifting due to the pain in his lower back. For example, he stated that he cannot lift five gallon containers of paint as required during a day of painting.   Wymore does no lifting in his current part-time employment as a driver. (Tr. 371).

### Testimony of the VE

Vocational expert ("VE") Patricia Reilly testified briefly at the hearing.  The ALJ asked her to discuss employment opportunities for a hypothetical person who was a person of Wymore's age, education, and work experience,  and who could lift or carry 10 pounds frequently and 20 pounds occasionally, stand, sit and walk six hours in an eight-hour day, and occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 387-88).  In addition, the VE was to assume that the person was restricted from working in extreme cold; and was to avoid concentrated vibrations; hazards such as ladders, ropes, and scaffolds; and concentrated exposure to fumes, odors, dust, gasses.  (Tr. 388). With regard to hand and wrist movements, the ALJ asked the VE to assume that the individual should avoid repetitive hand and wrist movements (Tr. 388), but explained that meant the hypothetical person could use his hands for fingering and feeling frequently, but not constantly.  (Tr. 389).  The VE was to assume that the person was "someone who is capable of doing routine, repetitive work, from a mental standpoint," and possess moderate limitation in carrying out detailed work, adapting to change in the work setting,

14

and responding to criticism from co-workers.  The ALJ explained, "I'm defining moderate as a deficit that is more than mild, not a marked deficit and would not prelcude work."  (Tr. 389).  The ALJ asked whether the hypothetical employee could perform any of the past work performed by Wymore.

In response, the vocational expert stated that the individual could perform Plaintiff's past work as a telemarketer, which she said is classified as a SVP-3 level which is semi skilled.  Then she stated that "based on my experience in the accepted job market, telemarketing really doesn't require skills.  It's really in the, its really considered an unskilled position." (Tr. 389).  Reilly also stated that there were other light exertion jobs in the local and national economy that he could perform, such as motor vehicle operation, taxi driver, machine operation jobs such as cutting, punching, and press machine setters.  (Tr. 389-90).  The expert also identified jobs such as housecleaning, messenger, and stock clerk which the individual could perform.   (Tr. 391).

## The ALJ Findings

The ALJ found that Wymore met the special earnings requirement of Title II of the Act on December 1, 2001.  She found that he had performed work activity since December 1, 2002, though she did not characterize it as substantial.  She determined that Wymore had the following medically determinable impairments that have imposed more than slight limitations upon his ability to function, but that did not meet or equal the Listings in Appendix 1 to Subpart P of Regulation No. 4: degenerative disc disease of the cervical spine status post fusion in June 2003; degenerative disc disease of the lumbar spine status post lumbar laminectomy in 1985; depression, drug and alcohol abuse, hepatitis B and C, asthma and carpal tunnel syndrome.

15

She found that Wymore is able to occasionally lift and carry up to 20 lbs. and 10 lbs. frequently, was able to perform simple routine work and occasional climbing, balancing, stooping, kneeling, crouching and crawling.  He needs to avoid concentrated exposure to extreme cold, vibrations, fumes, odors, gases, dust, poor ventilation and exposure to hazards.  She found that he should avoid work on ladders, scaffolds, and ropes, and that he should avoid repetitive movement with his hands and wrists, but that he can use his hands on a frequent basis for fingering and feeling – though not on a constant basis.  She found that he is capable of routine, repetitive work.  Mentally, she found that he would have moderate limitation in carrying out detailed work and adapting to changes in the work setting and responding to co-workers.  She found his limitations, apparently referring to mental limitations, to be more than mild but not marked, and she concluded that the mental limitations would not preclude him from working.

She concluded that Wymore is not disabled as defined in the Act, that he is capable of performing his past relevant work as a telemarketer and a significant number of light, unskilled jobs that are available in the state and national economies.

### Issues Presented

Wymore appeals the Commissioner's final decision on the following grounds:

- the ALJ's determination of residual functional capacity ("RFC") is not supported by substantial evidence, particularly in that the ALJ substituted her opinion for medical opinion in material ways;

- the ALJ's finding that Wymore is able to return to his past work as a telemarketer is not based on substantial evidence;

- the ALJ failed to properly develop the record;

16

- the ALJ's decision to discount Wymore's credibility is not proper under *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1986), including the ALJ's consideration of Wymore's alleged drug-seeking behavior; and

- The ALJ's hypothetical question to the vocational expert excluded serious impairments and was not based on substantial evidence.

## Standard of Review

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo. Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirm that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

**Analysis**

**"Disability" Defined**

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

**Sequential Evaluation and Residual Functional Capacity**

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe mental or physical impairment; 3) the impairments, singly or combined, meet the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

18

In this case, the ALJ completed all five steps in the evaluation process, though she determined at step four that Wymore was not entitled to benefits because he could perform his past work as a telemarketer.  Wymore appeals the ALJ's conclusions at steps 4 and 5, arguing that the ALJ's determination of Wymore's residual functional capacity ("RFC") was not based on substantial evidence.

RFC is defined as what the claimant "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*, including observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations.  *Id.* §§ 404.1545(a)- (c), 416.945(a)-(c).  *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000).  An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).  Both physical and mental limitations must be considered.

Wymore argues that the ALJ improperly determined his residual functional capacity (RFC) by erroneously discounting Wymore's testimony, in failing to fully develop the record of his limitations, and in substituting her own opinion for medical opinions in the record.  Because of these failures, Wymore contends that the ALJ posed a defective hypothetical question to the VE that did not set forth all of Wymore's limitations.

***Credibility Determination.***

It is well-established that a hypothetical question need only include those impairments and limitations found credible by the ALJ.   *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

19

Whether the ALJ properly discounted Wymore's credibility bears on the RFC determination made by the ALJ, that was used in the hypothetical posed to the VE.  Thus, the ALJ's evaluation of Wymore's credibility is crucial to this appeal.

The Eighth Circuit Court of Appeals recently summarized an ALJ's duty with regard to assessing a social security claimant's credibility relative to subjective complaints, including pain:

> A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. § § 404.1529, 416.929; *McKinney v. Apfel,* 228 F.3d 860, 864 (8th Cir. 2000); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   In evaluating subjective complaints, however, the ALJ must consider objective medical evidence, as well as any evidence relating to the so-called *Polaski* factors, namely: (I) a claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) dosage, effectiveness, and side effects of medication; and (v) functional restrictions.   *Polaski*, 739 F.2d at 1322.   In rejecting a claimant's complaints of pain as not credible, we expect an ALJ to "detail the reasons for discrediting the testimony and set forth the inconsistencies found."   *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003).

*Guilliams v. Barnhart*,  393 F.3d 798, 801-802 (8th Cir. 2005).

The ALJ stated:

The Claimant has a spotty work record and narcotics conviction which do not impact favorably on his credibility, especially motivation in obtaining and maintaining employment.  Nonetheless, following his surgery he has made attempts to return to work.  It is also noted that he was able to earn more wages in 2002 after his alleged onset date of disability than he had in most of the 14 years prior to 2002.  The progress notes from Dr. Tran and Lincoln Lancaster Health Clinic seem to evidence drug seeking behavior.  He appeared to be abusing Oxycontin receiving prescriptions for this drug from both clinics until this became apparent to the prescribing physicians.  Dr. Tran cut him off around December 2003 and Lancaster County stopped in April 2004.  It is also worth noticing that, subsequent to the Claimant's surgery and through March of 2004, Dr. Gelber was also prescribing hydrocodone.  However, it appears that that was the last time the Claimant saw Dr. Gelber and Dr. Gelber had not given him any restrictions.  The fact

20

> that the Claimant has a felony conviction for sale of cocaine was discussed
> he replied that he was involved "just on the business end" of the sale of
> cocaine.  Nonetheless the file contains drug seeking behavior and no work
> restrictions.  Since his doctors have stopped prescribing medications for him
> he has not been back to see any of his treating doctors for follow up and he
> is on no pain medications.

(Tr. 27).  ("[J]ust the business end" is taken from the ALJ's question, not Wymore's answer.)  She also stated that Wymore "appear[ed] to exaggerate" in his answers to interrogatories, stating for example, that it "takes him five minutes to zip up his pants but he is able to work as a truck driver."  (Tr. 27).  The ALJ stated that "there are many inconsistencies in the Claimant's testimony and in his statements of record," (Tr. 27), and yet she failed to set them out.  The ALJ concluded that "the Claimant's testimony, insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible."

Even though the ALJ cited *Polaski*, I find that she did not perform a thorough *Polaski* analysis.  Rather, in discrediting Wymore's testimony, she relied on evidence that, at least in part, was remote in time, taken out of context, and was lacking in probative value.  In particular, I find that the ALJ's concentration on what she characterized as "drug-seeking behavior" ignores that his treating physicians directed his care and managed his pain over more than two years with these medications.

The ALJ apparently relies on the 1993 opinion of Dr. Baldwin, who was Wymore's treating psychiatrist in 1993, for concluding that Wymore has substance abuse and addiction issues.  In Dr. Baldwin's note, he states that Wymore has significant limitations due to his mental disorders, including Bipolar Disorder, and due to his drug substance abuse and addition relative to alcoholism and Demerol.  Wymore stated that he stopped

21

drinking in 1997.  The ALJ's reliance upon a ten-year-old psychiatric record in support of a drug seeking behavior in 2002 and 2003, is not reasonable given the medical records that clearly demonstrate several physicians' treatment plans for Wymore included the use of narcotic pain relief.

The ALJ also relies on the fact that Wymore was obtaining prescriptions for pain relief medicine from both Dr. Gelber and the County physicians at the same time.  It appears that during four months following his June 2003 surgery, in July, August and September, and again in March/April 2004, Wymore was obtaining pain medicines from two sources.  However, the ALJ seems to ignore that Wymore's complaints of severe and chronic pain are supported by the medical records and objective medical tests.  As far back as 1985, at age 36, objective medical evidence exists showing that Wymore had moderate degenerative changes in his lumbar spine that required a laminectomy.   The MRIs performed in 1991 and 2003 establish that Wymore had  moderate to severe degenerative changes in his cervical spine, which required a C5-C7 cervical fusion in 2003.  Subsequent medical examinations and X-ray showed osteophytic spurring at C4, and physical findings indicative of carpal tunnel syndrome, including loss of sensation in his finger tips and weakness in his wrists.

Wymore's treating physician Dr. Tran managed his case with medications from December  2001, at the time of his alleged onset of disability date, until the pain became of such duration and severity that Wymore sought, with the assistance of his physician case worker, a neurological examination that resulted in surgery in 2003.  The record reflects that Wymore's use of Oxycontin and hydrocodone was being monitored by his physicians and their assistants, and that they discussed the habit-forming properties of his

22

pain medications with Wymore, and that when they became concerned about the duration, dosage and management of the medication, they stopped prescribing it to him.

Wymore left Dr. Tran's care and went to the County physicians at the recommendation of his case worker, so that he would be eligible for benefits paid through the County for the cervical fusion surgery.  After his surgery, he returned for follow up examinations with Dr. Gelber, and at Dr. Gelber's recommendation, he was contemporaneously followed by the County physicians as his primary care providers.  The medical records support that six months after the two level cervical fusion, Wymore did not feel his pain had been significantly reduced, though he agreed that his gait and coordination had improved.

His County physicians, who saw him monthly, continued to prescribe Oxycontin and hydrocodone to manage his post surgery pain until such time when they became uncomfortable with his use of the medications.  Undeniably, the medical records show that Wymore was receiving hydrocodone from Dr. Gelber's office contemporaneously with his receiving Oxycontin from the County physicians over approximately three or four months after his surgery.  The medical records do not support that he was keeping his care and prescriptions a secret from his providers.  Wymore testified that he weaned himself off the Oxycontin from April to May 2004, and that he felt he *was not managing* his pain well without the medication.

Despite the ALJ's blanket assertion that there are many inconsistencies in Wymore's testimony, I do not see them.  While Wymore retained significant range of motion on physical exam, the physicians noted that this motion came with pain.  In Wymore's interrogatory answers, he claimed disabling pain that prevented him from

23

walking more than a block, and at the hearing, he testified that he was unable to stand or walk for very long.  At the time of the hearing, Wymore explained that he was employed part-time driving a truck, but that he was not required to do any standing, sitting, or lifting in connection with his part-time employment.  He also explained that the jostling of the truck occasionally bothers his back.  He explained that in 2001 and 2002, he was forced to leave employment because he was unable to attend work, to lift items, and to keep pace with his co-workers, all because of his pain in his low back, upper back, neck and shoulders.

I do not find that Wymore's felony conviction bears significantly on his credibility regarding his subjective complaints, though it may contribute to what the ALJ referred to as his "spotty work history."   There is no doubt that Wymore has attempted to work and his pre-surgical attempts have failed, but this evidence supports his claim rather than detracts from it.

Unlike the ALJ, I do not find that Wymore's stated inability to quickly zip his pants is  inconsistent with his ability to drive a truck.  His inability to quickly zip his pants reflects a limitation in his fine manipulation function that is significantly impacted by nerves that emanate from the cervical region.  Wymore's statement is consistent with his medical records and MRI scans,  which include documented loss of sensation in the fingertips and symptomology attributable to carpal tunnel syndrome.

With regard to his recent "spotty employment record," Wymore testified at length about the reasons he felt he could not return to his former employment as a painter, noting his inability to "keep up" the pace and his tendency to drop tools.  This is consistent with his neck and low back pain and hand and wrist problems that are well documented in

24

medical records from 2002, 2003, and 2004.  He attempted to return to work on several occasions, and these attempts appear to have made his pain symptoms flair as he was not able to maintain employment.  In one social security administration interviewer's view, Wymore had not been able to perform substantial gainful employment after the alleged date of onset, which was December 1, 2001.  (Tr. 110).  Because I conclude that the ALJ failed to conduct a proper *Polaski* analysis and made her credibility determination based on evidence that did not support the determination, this matter will be remanded.

### ALJ's Duty to Develop a Complete Record

I will also remand because I conclude that the ALJ failed to discharge her duty to ensure that the facts were fully and fairly developed.  *See Mitchell v. Shalala,* 25 F.3d 712, 715 (8th Cir. 1994).

> It is settled law in this circuit that social security hearings are nonadversarial, and the ALJ is responsible, independent of the claimant's burden, for fully and fairly developing the record.  *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004).  The duty to develop the record extends to cases like this one where the claimant is represented by counsel.  *Id.*  "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record."  *Id.*

*Baker v. Barnhart*, 457 F.3d 882, 895 (8th Cir. 2006).  The Eighth Circuit Court clearly will not affirm decisions that are made based on an undeveloped record, and the Court has recognized that a record may be fully developed on some issues but not on other issues. See *Dixon v. Barnhart,* 324 F.3d 997, 1003 (8th Cir. 2003) (finding the record developed as to back pain but undeveloped regarding the plaintiff's daily life activities and how those activities relate to his ability to work; the significance of certain test results relied upon by

the ALJ; and, what the plaintiff's treating and examining physicians recommend in terms of the RFC.)

In developing the RFC, the ALJ states that she relied on "objective medical evidence in the record."  She relied, primarily it appears, on the residual functional capacities evaluation performed by an agency physician that was completed ten days before the cervical fusion surgery. (Tr. 193-202).  Wymore's condition was evaluated by two agency consulting physicians who performed physical functional capacities evaluations, one in March and the other in May of 2003, before the cervical fusion surgery.

The ALJ adopted some but not all of the limitations identified in Dr. Hadley's May 2003 report.  The ALJ adopted exertional limitations regarding lifting, standing and sitting, but there was one restriction which, while arguably adopted, was significantly modified by the ALJ.  Dr. Hadley recommended that Wymore "avoid prolonged, repetitive use of hands and wrists," (Tr. 194, 196), and he noted a limitation in fine manipulation - fingering. (Tr. 196).  The ALJ's translation of this limitation for use with the RFC determination was that Wymore "should avoid repetitive movement with his hands and wrists *but can use hands on a frequent basis for fingering and feeling but not on a constant basis*."  (Tr. 28). (Emphasis added). The ALJ provides no explanation or medical justification for this elaboration.

A review of Wymore's medical records and of the May 13, 2003 FCE was performed by Glen Knosp, M.D., in September 2003.  Dr. Knosp's FCE mirrors that of the May 13, 2003 FCE, and, in addition, it references records from Dr. Boes' May 23, 2003 exam, the June 17, 2003 surgery, and one post-surgical exam by Dr. Gelber from July 7, 2003.  In Dr. Knosp's opinion, Wymore "should be capable of work as outlined in the RFC."  Dr.

26

Knosp stated that Wymore has a history of degenerative disc disease in the cervical spine, symptoms of carpal tunnel syndrome, asthma and has been positive for hepatitis B and C, and is bipolar.  (Tr. 233).   Notwithstanding Dr. Knosp's post-surgical records review, I conclude that the record is not fully developed as to Wymore's functional capacities in the presence of neck and back pain or with regard to the effects of his carpal tunnel syndrome symptomology.   The ALJ is not wholly at fault for the incompleteness of the record; she extended to the Plaintiff's counsel more than five months to submit a final report of Wymore's treating physician that was to have included physical restrictions.   When the report was finally provided, it was accepted by the Appeals Council as part of the record, but it only contained an estimate of a typical recovery period and it did not address specific physical restrictions applicable to Wymore.   In the report, Dr. Gelber acknowledged that some patients' conditions do not improve after a cervical fusion, and for those who do improve, he feels that 18 months after surgery the person would have reached maximum medical improvement.   Dr. Knosp's evaluation apparently relied on the FCE record generated before Wymore's surgery, and I find that his records review was not a sufficient substitute for an updated physical FCE that should have been ordered by the ALJ.   On remand, an updated physical FCE should consider any exertional limitations and motor functions.   *See  Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) (ALJ may not draw upon his own inferences from medical reports); and *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002) (court may remand for taking of further evidence where ALJ fails to develop record fully).

Based on 1) the treating physicians' notes from the months following the surgery; 2) Wymore's continuing complaints of pain; 3) Dr. Gelber's opinion relative to an expected

period of recuperation; and 4) the symptoms of bilateral carpal tunnel syndrome that emerged in 2004, I conclude that another functional capacities evaluation should have been ordered by the ALJ following a reasonable time for recuperation after the surgery.

Because the ALJ did not have the benefit of Dr. Gelber's January 2005 report, or a post-recuperation FCE, and because I find no medical support for the ALJ's statement, which was used in the hypothetical, that Wymore is able to engage in frequent fingering,[2] I will remand this case for development of the record relative to Wymore's physical restrictions consistent with this memorandum.

***Psychological Limitations***

The ALJ found "depression" and "drug and alcohol abuse" to be two of Wymore's impairments, though she did not view Wymore's diagnosis of bipolar disorder as an impairment. The ALJ's exclusion of bipolar disorder and her inclusion of "drug and alcohol abuse" were not based on substantial evidence and these errors require remand. In 1993, Dr. Baldwin diagnosed that Wymore has "a mood swing disorder, mixed, called Bipolar Disorder, which is somewhat atypical and causes him to have episodes of irritability, argumentativeness, and a black, negative mood." (Tr. 244). Dr. Baldwin stated in 1993 that Wymore's bipolar disorder, in combination with his then-active substance abuse and dependence (with habituation to alcohol and Demerol), "represents a considerable and substantial limitation or handicap. . . . " Because of its age, Dr. Baldwin's 1993 opinion may not have been entitled to controlling weight, but as the only treating physician opinion related to Wymore's mental health and based on Dr. Baldwin's credentials as a board

---

[2] On page 384 of the transcript, Wymore's attorney asked about his limitations in regard to fingering, and Wymore was apparently reaffirming that the difficulties in fingering he described in answer to interrogatories still exists, but the ALJ terminated the questioning.

certified psychologist, Dr. Baldwin's diagnosis of bipolar disorder is entitled to significant weight.

The Court of Appeals for the Eighth Circuit has stated:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Singh,* 222 F.3d at 451. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

*Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001).

"The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole. *Id.* at 1013; *Holmstrom,* 270 F.3d at 720.

There is no evidence in the record that is inconsistent with Dr. Baldwin's diagnosis of bipolar disorder, mixed. Wymore testified that he has called Lancaster County's mental health clinic several times due to suicidal thoughts, but he did not go in for treatment for fear that he might be committed. (Tr. 370; 379-80, 382). In 2001, when he was still employed as a fork lifter, his primary care doctor prescribed Zoloft, which he quit taking after a few months because he felt the side effects of the medicine were "worse than the

problem" even though his coworkers noted some improvement to his mood. (Tr. 356, 370). Wymore stated that he has had difficulty getting along with other employees and has had outbursts of temper. (Tr. 379). He stated that he still feels depression, has suicidal thoughts daily, dislikes crowds, and feels nervous and paranoid. (Tr. 379-80).

In addition to Dr. Baldwin's 1993 opinion letter and Wymore's own testimony regarding his mental health, the ALJ also had available the reports of Dr. Ritchie and Dr. Brayman, both of which were generated in 2003 based on one-time evaluations. Based on Dr. Ritchie's evaluation, she concluded that Wymore suffered from Major Depressive Disorder, severe; and an anxiety disorder with panic attacks. She also recognized the need to try to rule out bipolar disorder, though he described to her periods of depression and mania. Dr. Ritchie acknowledged Wymore's history of alcohol and drug abuse, but found them in "sustained full remission." (Tr. 276-77). Dr. Ritchie assigned a GAF score of 40, and found that Wymore had restrictions in daily living due in part to his severe anhedonia; difficulty in maintaining social functioning; current episodes of deterioration under stress; and problems relating to coworkers and supervisors. (Tr. 273-78).

Similarly, Dr. Brayman found that Wymore suffered from an affective disorder, including disturbance of mood and bipolar syndrome, and that he also had an anxiety and personality disorder. (Tr. 203-221) Dr. Brayman stated that Wymore appeared to have "moderate limitations based on his psychological condition, but appears capable of simple, unskilled employment." (Tr. 221).

The ALJ did not assign "significant weight" to Dr. Ritchie's report, stating that it was a one-time evaluation and the evaluator's conclusions were based upon Wymore's self reporting.

30

The ALJ made no mention of the fact that Wymore had stopped drinking, that Dr. Ritchie found his drug and alcohol dependence was in sustained, full remission, or that Dr. Brayman noted his sobriety since 1998.  Substantial evidence does not support the ALJ's inclusion of alcohol and drug abuse as a current impairment.  The ALJ also did not note that Wymore has altered his activities of daily living to accommodate his mental stressors.  For example, he goes to the grocery store late at night to avoid people.

The ALJ found that Wymore has moderate restrictions of activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty in maintaining concentration, persistence and pace and has no episode of decompensation of extended duration. (Tr. 24). The ALJ noted that Wymore had the ability to understand, remember and carry out short and simple instructions.  In determining Wymore's mental RFC, the ALJ stated that his limitations in carrying out detailed work, and adapting to changes in the work setting and responding to coworkers would be more than mild, but not marked, and "would not preclude work."

I find that the ALJ stated no reasonable justification for rejecting Dr. Ritchie's psychological assessment, since most of the psychological assessments are based in large part on the self-reporting of the patient, and because the report is consistent in several respects with Dr. Brayman's report, and Dr. Baldwin's diagnosis of bipolar disorder. *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir.1992) (per curiam) (reversible error for ALJ to substitute his own conclusions for diagnosis of examining psychiatrist).  See *Morse v. Shalala,* 32 F.3d 1228, 1230-31 (8th Cir. 1994) (reversing a finding of not disabled where the ALJ relied on an old medical report and gave no weight to subsequent supporting evidence, including the treating physician's progress notes that indicated continued pain

31

consistent with the claimant's subjective complaints). The claimant "is entitled to a fair evaluation of [his] capabilities," *O'Leary v. Schweiker*, 710 F.2d 1334, 1342 (8th Cir. 1983), and the "ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work history, and observations by third parties and treating and examining physicians." *Morse*, 32 F.3d at 1230 (quotation omitted). Because I conclude that the ALJ did not give full consideration to all the evidence presented that relates to Wymore's psychological impairments and attendent mental restrictions, I will remand for further proceedings on the mental health portion of this claim. On remand, the ALJ shall consider, and develop the record more fully if need be, whether Wymore's bipolar disorder, anxiety disorder, and personality disorder are related to what has been characterized as his "spotty employment record" and how these disorders may affect his ability to specifically *maintain* employment, including as a telemarketer.[3]

## Conclusion

I find that the ALJ did not properly evaluate Wymore's credibility. Her decision to discount Wymore's subjective complaints, including his complaints of pain, based on inconsistencies is simply not supported by the record. I also find that the record is incomplete, and that an updated physical functional capacity evaluation is needed in this

---

[3] Taken from the Directory of Occupational Titles: 299.357-014 TELEPHONE SOLICITOR (any industry) alternate titles: telemarketer; telephone sales representative
    Solicits orders for merchandise or services over telephone: Calls prospective customers to explain type of service or merchandise offered. Quotes prices and tries to persuade customer to buy, using prepared sales talk. Records names, addresses, purchases, and reactions of prospects solicited. Refers orders to other workers for filling. Keys data from order card into computer, using keyboard. May develop lists of prospects from city and telephone directories. May type report on sales activities. May contact DRIVER, SALES ROUTE (retail trade; wholesale tr.) 292.353-010 to arrange delivery of merchandise. GOE: 08.02.08 STRENGTH: S GED: R3 M3 L3 SVP: 3 DLU: 88.

case.   The ALJ is directed to obtain physical restrictions, if any, from Wymore's treating physician, and if that is not possible, then to order a new physical FCE.  Particular attention needs to be given to Wymore's ability to sit, stand, and to perform fine manipulation.  I conclude that the ALJ erroneously rejected 1) Dr. Baldwin's opinion related to Wymore's bipolar disorder, and 2) the evaluation performed by Dr. Ritchie.  The ALJ shall obtain an opinion from a mental heath professional relative to the effect of Wymore's mental limitations on his ability to maintain employment after he is hired.

Because of these errors, I conclude that the Secretary failed to meet her burden to demonstrate that Wymore retains the RFC to perform his past work as a telemarketer and the full range of light work.   I remand for further proceedings consistent with this Memorandum,

IT IS ORDERED:

The case is reversed and remanded.

On remand, the ALJ should further develop the record to document Wymore's current physical and mental limitations; reconsider Wymore's credibility after performing a *Polaski* analysis, and determine his residual functional capacity based on both the physical and mental limitations, and other proceedings consistent with this Memorandum and Order.

A separate judgment shall be filed.

DATED this 8th day of February, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge